DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which entered a judgment granting permanent custody of appellant's six children to Lucas County Children's Services. For the reasons that follow, we affirm the decision.
 {¶ 2} In January 2001, appellant's six children were found to be dependent and neglected due to appellant's substance abuse, "unstable housing and inconsistent care of her children." The children were placed in foster care. The goal of the case plan was reunification, and the parties worked toward that goal until October 7, 2002, when Lucas County Children's Services ("LCCS") moved for permanent custody. A hearing on the permanent custody motion was held over five days in December 2003. The facts of this case are fully set out by the testimony of this hearing.
 {¶ 3} LCCS caseworker Kim Shields was the first to testify. She became involved in the case in October 1999 when appellant had given birth to Sharika, who had tested positive for cocaine. Shields conducted an investigation. In the course of doing so, she interviewed appellant in the hospital. Because appellant admitted a substance abuse problem, indicated a willingness to undergo treatment on her own, and had adequate housing, LCCS did not at that time file a complaint seeking custody of the children. Instead, Shields assisted appellant in obtaining substance abuse treatment at Fresh Attitudes. However, appellant did not comply with the drug treatment program, and in fact delivered another baby, Cortasha, who also tested positive for cocaine, in October 2000. At this same time, appellant was evicted from her apartment and had no stable housing. She admitted to Shields that she was using crack cocaine every day, even while pregnant. Shields advised appellant to go to a hospital to get help as she was close to delivering Cortasha.
 {¶ 4} LCCS then began attempting home studies to determine if a viable relative-placement existed for the children. When LCCS was unable to approve a relative for placement, LCCS took temporary custody of the children and placed them in foster care. Shields prepared a case plan calling for substance abuse treatment and counseling for appellant. The purpose of the counseling was to address appellant's feeling "overwhelmed" by the children's problems and needs and to address appellant's childhood sexual abuse, which was apparently never addressed earlier. According to Shields, appellant had grown up in a "chaotic" and abusive home, and it was imperative for appellant to address these issues in counseling so that she could develop skills to protect her children from a similar fate. The plan also called for appellant to obtain stable housing and for the children to get help with their behavioral issues.
 {¶ 5} Appellant was discharged from Fresh Attitudes in late August or September 2000 for sporadic attendance, and after having Cortasha in October, she went straight from the hospital to inpatient treatment at Compass. After approximately 30 days in Compass, in November or December 2000, appellant moved to Aurora House, a residential treatment facility for mothers and children that offers basic parenting services. The plan at this point was to reunify appellant and her children. Appellant stayed at Aurora House until May 2001, when she graduated to their "step up" program. As a part of this program, appellant was provided her own apartment. Because the staff at Aurora House believed that appellant was progressing well, appellant was allowed unsupervised visits with the children in this apartment at least once weekly. When Shields would stop by to check on how appellant was doing with the children, appellant was, according to Shields, "overwhelmed" by them. Shields reported a very chaotic environment that was "very stressful" for appellant and for the children.
 {¶ 6} In approximately August 2001, appellant was provided a bigger house on Stickney Avenue. LCCS was still working toward reunifying appellant with the children, and the Stickney Avenue home was large enough to accommodate all of the children. The visits with the children continued, progressing to weekend and overnight visits. In fact, Shields recalled that reunification with Pernell had actually occurred. Then, in September 2001, appellant had a relapse. She admitted to being overwhelmed by the children, and she admitted going on a three-day crack cocaine binge and allowing a known drug user to stay in the house. According to Shields, appellant was using drugs in the house with the children upstairs. After this relapse, appellant met with workers at LCCS and agreed to contact the Aurora House case manager once daily and not to have any more contact with the drug user living in the home. When appellant failed to follow through on this agreement, staff at Aurora House confronted her. Appellant reportedly became belligerent and verbally aggressive with the staff, and she was given 24 hours to get out of the house.
 {¶ 7} After the relapse, LCCS filed for a six-month extension on the case plan. Around this time, appellant had been dismissed from Unison for failing to follow through with individual counseling, so as a part of the extension, appellant was again told to undergo counseling to address her sexual abuse as a child. She was also to make use of services to help her deal with her children, and she was, of course, to go back to drug treatment. The children also required counseling again because of the stress of being close to reunification and then being removed because of the relapse. Shields reported that the children were "sad" and confused about not being able to stay with their mother anymore. Supervised visitation at LCCS was required.
 {¶ 8} Around this time, appellant was referred to Lucas County Family Drug Court, as she had failed to cooperate with LCCS's attempts to get her back into Aurora House. She began a program there in November or December 2001. As a part of this program, appellant was to meet with the judge once weekly, to submit to random urine screens, to attend drug treatment through Fresh Attitudes, to meet with a case manager from Lucas County TASC (Treatment Alternatives to Street Crime), and to meet with Shields regularly. Appellant successfully completed drug treatment, and she began working with Lucas Metropolitan Housing Authority ("LMHA") to obtain housing for herself and her children. Because appellant was progressing well, she was again allowed overnight visits with the children sometime in the spring of 2002. In terms of counseling, while appellant did complete individual counseling for anxiety and depression through Unison (and received medication for these conditions), she never attended counseling to address the childhood sexual abuse issues. Nevertheless, once appellant secured housing through LMHA, she was reunified with Pernell and Devonta in late June 2002. Because appellant had trouble dealing with all of the children at once, LCCS planned a staggered reunification beginning with the older boys.
 {¶ 9} In the spring of 2002, appellant began bringing her new boyfriend, Fred H., to visits. Shields did an investigation of him and found that he had a "history" with LCCS. According to a document identified as Exhibit 2, which Shields testified is kept in the ordinary course of business, Fred. H. had been named as a sexual abuser of a fouror five-year-old girl. The sexual abuse was substantiated through physical evidence, but Fred H. was never prosecuted because, according to Shields, the victim was too young to testify. However, Shields testified as to her understanding that he may still be prosecuted when the child becomes competent to testify. After Fred signed a release, Shields divulged this information to appellant, who was not sure whether or not she believed the allegations. However, LCCS staff told her that if she continued to allow Fred to be in contact with her children, she would not be reunified with them. Appellant agreed to end the relationship because she wished to have her children back.
 {¶ 10} On July 1 and again on July 3, 2002, appellant signed safety plans that were put in place to protect her children from Fred. According to Shields, a safety plan is a document prepared when a specific risk to a child or to children is identified. It is designed to lower the risk by, in this case, eliminating contact between the person posing the risk and the children. Shields testified that appellant violated the safety plans by allowing Fred to have contact with the children on July 4, 2002. When LCCS staff confronted appellant about violating the safety plan, she indicated that she did not believe the allegations against Fred and that she did not believe that he had ever harmed her children. LCCS again filed for temporary custody of Pernell and Devonta, who had been reunified with their mother, and they were placed back in foster care. Shields stated that, upon speaking with the boys, they again were sad and confused about being removed from their mother's care and being placed back in foster care.
 {¶ 11} At some point, while searching the computer on an unrelated case, Shields learned that Fred had an outstanding warrant in California for failing to register as a sex offender. Shields viewed a Lucas County booking photo of Fred and indicated that she recognized him as appellant's boyfriend. When confronted with Fred's criminal record, appellant again stated that she did not believe the allegations.
 {¶ 12} On July 8, 2002, as a result of a shelter care hearing, the magistrate ordered that Fred have no contact with the children. After the magistrate issued the "no-contact" order, appellant allowed Fred to accompany her to the foster home in which Devonta was living. Appellant became hostile with Shields when Shields confronted her with this information. Sometime between July 2002 and March 2003, appellant had given birth to a child fathered by Fred, and they were married. In October 2002, LCCS moved for permanent custody of the children.
 {¶ 13} Shields testified as to the efforts she and LCCS made to reunify appellant with the children. Shields indicated that she encouraged appellant to get treatment for substance abuse, to complete parenting programs, to secure housing, to obtain counseling for appellant's childhood sexual abuse, to visit regularly with the children, to get counseling for the children, to enroll the children in school, to put the children's interests before her interests, and to make good decisions for the children's care. When asked what she thought was "missing in this picture," Shields testified that, despite the services and support offered to appellant, appellant had not been able to put her children's interests above her own. Shields believed, in other words, that appellant lacked "protection skills for the children." Appellant never underwent counseling to deal with the sexual abuse she suffered as a child, and Shields believes that never addressing this victimization has handicapped appellant's ability to protect her children and to develop empathy.
 {¶ 14} Shields also reviewed the children's placement histories. She indicated that Cortasha, Sharika, Vanity, and Brittany are in one foster home together and had been in that same care for the pendency of the case, though Vanity had lived for three weeks or so with her father, who decided he could not manage her. Devonta was placed in a foster home, reunified with his mother, removed from his mother, reunified, and removed again. He was with the same foster family until December 2002, when he was placed in the same foster home as Cortasha, Sharika, Vanity, and Brittany. Pernell was similarly removed from his mother's care, reunified, removed, reunified, and removed again. Each time he was removed he went back to the same foster family. The foster mother to Cortasha, Sharika, Vanity, Brittany, and Devonta is now willing to adopt all of them as well as Pernell, and Shields expressed her opinion that permanent custody to LCCS to facilitate this adoption would be in the children's best interests.
 {¶ 15} Shields described the children's special needs. Vanity has Down's Syndrome. Pernell, Devonta, and Brittany have been in and out of counseling for several years. At one year old, when she came into foster care, Sharika was developmentally delayed. After working with Wood County Board of Mental Retardation, she is now "developmentally on target." Cortasha, who was exposed to cocaine in utero, similarly benefited from Early Intervention.
 {¶ 16} Shields also recited appellant's history with LCCS. Appellant had open cases with LCCS in 1993, in March 1995, and from September 1995 to January 1998. The current case was opened in 1999. In the previous cases, LCCS identified the major issue as drug abuse.
 {¶ 17} On cross-examination by appellant's attorney, Shields explained why she described appellant's upbringing as "chaotic." She indicated that appellant's mother was a drug abuser, appellant witnessed domestic violence in the home, appellant's family was unable to protect her and she was sexually abused, she began using drugs at a young age, and she became pregnant at 14. All of this history, according to Shields, negatively impacted appellant's ability to care for and protect her own children.
 {¶ 18} When asked how she knew that appellant was using drugs with the children in the house during the September 2001 relapse, Shields explained that Brittany reported this to her. Also, appellant was having weekend visits, and she admitted using drugs on a weekend. Shields acknowledged that appellant completed therapy for anxiety and treatment for drug abuse, but she contends that, at least during the time that she worked on the case, appellant never formally addressed the childhood sexual abuse. When pressed on this issue, Shields indicated that appellant never attended the Adults Molested as Children ("AMAC") group at Unison. However, she also noted that appellant transferred her care from Unison to Catholic Charities, and she may have attended such counseling there.
 {¶ 19} Upon questioning about Fred's contact with the children, Shields indicated that appellant allowed Fred to violate the safety plan, not the no-contact order, by allowing Fred to attend visitation with her at Devonta's foster home. After the no-contact order was issued on July 8, 2002, appellant brought pictures of Fred to the foster home to show the children. She also indicated that Fred drove another of appellant's children, Erika (who is not a party to this case) to Drug Court, even though the no-contact order included Erika as well as the other children. Shields acknowledged that it was actually Fred, not appellant, who violated the order by driving Erika. Finally, Brittany disclosed that, when the children were being transported to LCCS to visit with their mother, she saw Fred in a car with appellant.
 {¶ 20} Shields also discussed the agency's August 2, 2002 decision to seek permanent custody. While Shields acknowledged that appellant had completed treatment for drug abuse by August 2002, she had engaged in counseling at Unison, and she was involved in "fairly appropriate" visitation with her children, the agency sought permanent custody because, despite all of the support and services offered to appellant, appellant "continued to make bad decisions that put her children at risk." Her continued relationship and marriage to Fred was a major indicator of appellant's failure to recognize risks to her children.
 {¶ 21} On re-direct examination, Shields testified that appellant admitted to spending $1,500 in three days during her September 2001 relapse. Shields also identified a document dated September 24, 2002 in which appellant refused any further services from LCCS and indicated that she was transferring her care to Catholic Charities.
 {¶ 22} Jennifer Cawthorn, a case manager at Unison, was the next to testify. Appellant was referred to Cawthorn in January 2002. Appellant expressed her wishes to see a Unison psychiatrist for needed medication, to obtain stable housing, and to be reunified with her children. Cawthorn testified that Unison helped appellant work with LMHA and gave her a referral for both home-based therapy and for AMAC. Cawthorn indicated that appellant was agreeable to AMAC but that she never completed it. Around August 2002, appellant became less consistent in keeping appointments, and in late September 2002, appellant left Unison, indicating that she was transferring her care elsewhere.
 {¶ 23} On cross-examination by appellant's attorney, Cawthorn stated that appellant was initially very compliant with Unison, and that she saw a Unison psychiatrist who monitored her medication on a daily basis until July 2002. At that time, appellant was pregnant again and she wanted her obstetrician to monitor her medication.
 {¶ 24} Next, Rose Siler testified. Siler was the LCCS caseworker who handled the case during Shields' vacation in July 2002. She stated that LCCS received information that appellant had allowed the children to have contact with Fred on July 4, 2002. She testified that she and her supervisor drove to appellant's house on July 5 and observed a gray colored car in the driveway that she believed to be Fred's (although she could not remember why she held this belief). Siler's supervisor did not feel comfortable confronting appellant at home, saying that Fred had a history of domestic violence, so they arranged for a staffing at the office. Siler called appellant on the phone to tell her of the staffing, and appellant's behavior on the phone alarmed Siler. According to Siler, appellant said that her children would be lying if they said Fred was there. Appellant also said, according to Siler, "I am going to F-ing kill 
myself if CSB trie[s] to take my kids." Appellant was yelling and swearing. As one of the children had answered the phone when she called, Siler told appellant to stop swearing and threatening suicide in front of the children. Appellant denied that the children were there.
 {¶ 25} At a shelter care hearing on July 8, 2002 appellant admitted that Fred was at the house on the 4th of July. The court issued an order that the children were not to have contact with Fred. The children were removed from appellant and placed back into their foster homes. Siler described the scene as being emotional, with appellant telling the children to call every day. Appellant gave the children a phone number to call, which Siler later learned was Fred's phone number.
 {¶ 26} On cross-examination, Siler testified that the foster mother told her that appellant violated the no-contact order in July 2002, when she brought Fred to the foster home and allowed the children to go to the car to talk with him. Devonta admitted to Siler that he spoke with Fred in the car on this occasion. With regard to the July 4 incident, when appellant was screaming on the phone that she was going to "f-ing" kill herself, appellant later told Siler that she was not really suicidal; she was just angry. Siler advised her not to say these things in front of the children, as appellant had by now admitted that the children were present at the time.
 {¶ 27} Siler testified that she investigated the allegation that Fred was at the house with the children on July 4 by speaking with both the children and with Bessie C., who is either appellant's mother or her sister. They confirmed that Fred was there on July 4. Another relative, Bernice (a "god-sister") was there for part of the visitation during this period and denied that Fred was there.
 {¶ 28} Brittany's therapist from Children's Resource Center, Christine McVay, also testified. McVay counseled Brittany from April 2001 until January 2002 and then again from April 2003 until July 2003. When McVay first met Brittany, Brittany was having trouble adjusting to the addition of her sister, Vanity, to her foster home. (Vanity has Down's Syndrome and requires much attention.) Brittany was acting aggressively toward herself and others, and she also had anxiety and worry about her mother — how her mother was and whether they could move back in with her. She was diagnosed as having "adjustment disorder with mixed emotions in conduct," and she was also tentatively diagnosed with ADHD. McVay's plan for Brittany was to work toward improving her social and coping skills, not hurting herself, and verbalizing her thoughts and feelings. During this initial period of therapy (April 2001 to January 2002), Brittany made good progress in her therapy: She was not hurting herself anymore and she was doing better in the foster home and in school.
 {¶ 29} McVay was asked about the period of time in late summer or early fall 2001 when Brittany and her siblings were close to being reunified with their mother. McVay reported that Brittany had problems in mid- or early July 2001, when she was hitting others in the foster home and not being able to express her feelings well. McVay described her as being "frustrated and angry" during this time. In April 2003, when McVay again became involved with Brittany, Brittany was again having trouble adjusting, this time to the addition of her brother Devonta into the foster home. Her diagnosis continued to be adjustment disorder, but she was also firmly diagnosed with ADHD. McVay reported that Brittany made little progress during her second round of therapy with her. McVay expressed her opinion that Brittany needs to be in a home where there is consistency and structure. McVay has seen Brittany with her foster family, and she believes that Brittany and her foster mother have a "nice close relationship." McVay also observed that Brittany loves and is bonded to her mother but is very worried about her. Finally, when asked whether she would ever recommend Brittany's reunification into a home with a sex offender, McVay responded that she would never recommend any child be placed in a home with a sex offender.
 {¶ 30} On cross-examination, McVay acknowledged that Brittany has reported receiving love and care from her mother. She also testified that when she last saw Brittany in July 2003, Brittany stated that she liked being in the foster home, and she liked being with her brothers and sisters, and wished to stay there.
 {¶ 31} When questioned on cross-examination about the problems inherent in reunifying a child with a parent, McVay testified that reunification would be difficult for any child. However, because of Brittany's particular problems with adjustment, she would have even more problems. She believes that family-type therapy would help in such a situation. When questioned about Brittany's feelings about being reunified, McVay indicated that Brittany looked forward to visits with her mother and that it would be difficult for Brittany (or for any child) to stop seeing his or her parent.
 {¶ 32} On re-direct examination, McVay testified that Brittany's problems flared up during the period when she was close to reunifying with her mother and the reunification was postponed. Finally, she testified that it would be in Brittany's best interest to be placed with her siblings.
 {¶ 33} Randy King, a therapist who treated Brittany after McVay, also testified about Brittany's progress after July 2003. He indicated that Brittany's behavior at school has improved, but that her academic performance has suffered. He said that his contact with the foster mother has been limited, but Brittany appears to be "comfortable" with her foster mother and that she respects her foster mother. King also testified that Brittany appears to want to stay in the foster home with her siblings. She also enjoys getting together with her mother, and she understands that she cannot live with her mother because her mother's husband is a sex offender. King offered his opinion that Brittany needs to be in a consistent, structured environment with rules.
 {¶ 34} On cross-examination, King indicated that Brittany has stated that she would like to live with her mother.
 {¶ 35} Next, Deputy Sheriff Ernest Lamb testified. Lamb investigates sexual abuse cases for LCCS and is also in charge of ensuring that sex offenders in Lucas County follow the registration laws. He testified that he knows Fred because Fred's father used to work in the Sheriff's department. He also is acquainted with Fred because Fred contacted him to "determine if he [Fred] was a registered sex offender or not." Lamb's testified that his research disclosed that Fred was classified as a sex offender in California for a crime committed sometime in the 1970s. Fred was required to register in California as a sex offender but allegedly failed to do so. Lamb was unsure whether Fred was required to register in Ohio because the California conviction is so old. Lamb also learned that California had a warrant for Fred. Because of the California warrant, Lucas County issued a warrant, and Fred actually turned himself in. However, California declined to extradite him, and the California warrant is still outstanding.
 {¶ 36} On cross-examination, Lamb testified that he did not know what the California conviction was for, but he gathered from talking with a California Clerk of Courts that the offense was for abduction "with intent to rape." Fred denied "the rape part." Appellant's attorney posed the following question to Lamb: "So you're saying that clearly there is no obligation in the state of Ohio for Mr. [H.] to register as a sex offender; is that correct"? Lamb answered, "Correct." According to Lamb, Fred said that he did not think he had to register as a sex offender in California.
 {¶ 37} On re-direct examination, Lamb testified again that he is unsure about whether Fred is required to register as a sex offender in Ohio, and that it is common for sex offenders to deny the offense of which they are accused.
 {¶ 38} Next, Annette R., the children's foster mother testified. Except for Pernell, Annette has been the foster mother for all of the children involved in this case. Brittany and Sharika came first on October 13, 2000; Cortasha came on October 16, 2000, approximately four days after she was born; Vanity came in November 2000; and Devonta came later, in December 2002. Annette described the children as they were when the came to live with her. Brittany was scared and "very dirty." Her hair was "a mess." Brittany was afraid that the foster parents would strike her; she told Annette that appellant gave her bruises on her legs. When Sharika came to live with Annette, she was one day shy of her first birthday and she could neither walk nor talk; she could barely crawl. She screamed often and needed to be held much of the time.
 {¶ 39} As other witnesses had testified, Brittany has behavior problems. At first, according to Annette, Brittany's behavior in her house was not bad, but it became worse when Vanity came to live with them. Vanity, as indicated, has Down's Syndrome and has many special needs. Though Brittany was six at the time, she was unable to care for herself and for her own needs and she struck out at Vanity, hitting and yelling at her. Brittany was diagnosed with ADHD, and she takes medication for that as well as a lowdose anti-depressant.
 {¶ 40} When Vanity came to stay with Annette, she was five years old. She was, according to Annette, like a baby. Her speech skills were limited; Annette testified that she had basically no vocabulary and Annette could not understand anything she said. Vanity was stealing objects and food and was hitting and kicking both adults and children. She has been in speech therapy, and over time, her language and behavior have improved greatly.
 {¶ 41} When Cortasha came as an infant, she was positive for cocaine, and she shook a lot. Medical professionals gave her drugs to ease her withdrawal from the cocaine. She weighed five pounds and was sixteen inches long.
 {¶ 42} Devonta was approximately nine when he came to stay with Annette. She described him as happy to be with his sisters and happy to have the company of males in his life. He has bonded well with his foster father and calls him "Dad," and he enjoys activities with his foster father and other men in the family. However, Devonta has reading problems. At nine, he read at a first-grade level. He now reads at the secondgrade, second-quarter level.
 {¶ 43} Annette also described her relationship with appellant. Annette described their relationship as starting out "rocky." Appellant complained that Annette did not care correctly for the children's hair and that the children were dirty. Annette testified that she often drove appellant places and also saw her when she (Annette) would drive the children for visitation. She described the interaction between appellant and the children as "chaotic," with the younger children crying and the older children running around and screaming. She testified that visitations were stressful for appellant when all of the children were there, and once she saw appellant yell at, and then raise her hand to, Brittany. When appellant remembered that Annette was there, she stopped. Soon afterward, visitation was moved to LCCS. Annette testified that the children loved their mother and responded well to her, but appellant was unable to control them. Annette also indicated that when appellant had her relapse in 2001, and reunification was postponed, the children were sad and were concerned about whether they would have to be moved again.
 {¶ 44} Annette also testified that about a year later, when reunification was again imminent, she drove the children (Brittany, Sharika, Cortasha, and Vanity) to appellant's house for visitation on July 4, 2002. When she picked up the children after their visitation, Brittany told her that Fred was there and pointed out his car in the driveway. When Annette was in the house she did not see Fred. Brittany explained that this was so because Fred was upstairs sleeping. This event led to the staffing and the safety plan, and appellant indicated that she would stop seeing Fred. Then, when visitation again moved back to LCCS, Brittany was angry and told Annette that it was "going to be all her [Brittany's] fault again." Annette explained that it was not Brittany's fault, that it was appellant's fault, but Brittany "cried and carried on" and stated, "But that doesn't matter. She's [referring to appellant] just going to blame me again." Annette explained that after visitation was moved back to LCCS, Brittany told her that she did not like visiting anymore because everyone (her siblings and mother) told her that the change in visitation was her fault. Annette testified that, according to Brittany, appellant told Brittany that if Brittany had "just kept her mouth shut, they would have been home by now." According to Annette, such blame takes place presently.
 {¶ 45} Annette described the services the children have received. After receiving services for about a year for children with physical and mental handicaps, Sharika no longer needs services and is "on track" and in preschool. Cortasha, who was born with cocaine in her system, also benefited from early intervention services but is now also "on track." Devonta, as indicated, is reading better. Brittany underwent therapy and had been doing better until October 2003. At that point in time, she returned from a visit with appellant, and her behavior had deteriorated; she was hurting herself, hitting others, and screaming. According to what Brittany told Annette, appellant told Brittany that Annette only cared for the children because she wanted the money, that Annette did not care about the children, and that she, in fact, hated them. Annette, on the other hand, testified that she loves the children and is willing to adopt all six of them.
 {¶ 46} Annette testified about her interactions with Fred H. She recalls meeting him at a staffing. She also recalls that in February or March 2003, after the birth of appellant and Fred's baby, Annette and appellant were transferring the children after a visitation, and a woman Annette did not know was accompanying appellant. The woman introduced herself as Fred's sister. Fred's sister told the children to go to the car to "say hi to your daddy," referring to Fred. All of the children went to the car except Brittany. The woman told Brittany that Fred was Brittany's "new daddy" and she should come and say "hi" to him. Annette was asked whether Fred had ever threatened her. She responded that, according to Brittany, Fred had said that if "anyone ever tried to take his F-ing kids, he would kill them." Annette testified that she "took this personally."
 {¶ 47} Annette then testified that she and LCCS had to change the routine to drop off and pick up the children for visitation because appellant had been verbally aggressive. According to Annette, appellant began saying things "to the air" such as "I am just tired of this f[____]ing bull[____]. Everybody just makes up lies about me." She also told the children that it was Annette's fault that they could not see their cousins. According to Annette, appellant often used this kind of foul language around the children. This kind of behavior made Annette uncomfortable, and after that she drove into LCCS's garage and a worker brought the children out to her at the end of their visitation period.
 {¶ 48} On cross-examination, Annette was asked whether she thought it was appropriate that the children called her and her husband "Mom" and "Dad." Annette testified that Brittany and Vanity began calling her "Mom" after the first failed reunification; she told the children that they did not have to do so, but they wanted to. Annette was also asked about Brittany saying that appellant blamed her for the family's predicament. Annette testified that these statements seemed to crop up both times that the family was close to reunification and it was postponed or cancelled. In terms of Brittany's problems in school, Annette testified that Brittany does her homework and then fails to turn it in. She testified that she has grounded Brittany for failing to turn in homework, and this strategy has appeared to help.
 {¶ 49} Annette also testified on cross-examination that since summer of 2003, Brittany has come home from visitations in a bad mood, and after she "yells and screams" at people, she is sent to bed early. She testified that both Brittany and Devonta say that they would like to go home, but if they cannot, they wish to stay with Annette and her husband. Annette also again indicated that she wished to adopt the children and she would not allow appellant visitation if she did so. Finally, Annette acknowledged that LCCS has provided respite care, and Annette had availed herself of that service the previous weekend when Brittany's behavior was bad. She admitted that she would not have such service were she to adopt the children, and she admitted that, because of Brittany's behavior problems, her home was chaotic at times, too.
 {¶ 50} Joyce Ransom, a parent educator at LCCS, was also called to testify. She teaches a 12-week parenting class, and appellant was a student in this class in 2002. The class covers relaxation and coping strategies as well as practical skills for dealing with one's children. As a part of the course, Ransom administered a test to appellant known as the Child Abuse Potential Inventory ("CAPI") which, as the name suggests, is designed to assess a parent's potential to commit child abuse as well as the level of stress the parent is experiencing. Ransom gave the test both as a pre-test and a post-test. Appellant's results on the pre-test were determined to be invalid because the computer detected inconsistent answers indicating that appellant was lying for some of the questions. When appellant took this same test as a post-test, she scored 309 on the potential abuse section and 203 on the stress section. The mean for each section is 150-160; appellant's scores thus indicated a high potential for abuse and a high stress level.
 {¶ 51} Ransom also testified that she was present at the meeting where appellant was confronted with Fred's history with LCCS. She testified that she explained to appellant that based on both hers and Fred's history, there was a possibility that appellant's children could be sexually abused. Ransom recommended that appellant undergo therapy to deal with her past abuse, and she explained that if childhood sexual abuse is not adequately addressed in therapy, there is a likelihood that the victim, as an adult, will not be able to protect her own children from sexual abuse. Appellant indicated that she would seek counseling for these issues. With regard to Fred's history, Ransom testified that appellant seemed receptive when told that she should not continue to see Fred, but her later actions belied this.
 {¶ 52} In the end, appellant failed the parenting class. She failed for "poor judgment" and lack of empathy, both of which stemmed from her continued relationship with Fred. Ransom explained that if one does not develop empathy, one cannot adequately protect one's children.
 {¶ 53} On cross-examination, Ransom testified that she was unaware whether the CAPI test has ever been scientifically proven. She testified later on cross-examination that watching how someone is behaving is actually more important than the results of the CAPI and that the CAPI test had nothing to do with her decision to fail appellant in the parenting class.
 {¶ 54} LCCS's attorney called appellant to testify as if on cross-examination. Appellant named all of her children. She testified that her first child is Marcus, who was born when appellant was 14 years old. His father is deceased, and he and appellant were never married. Appellant testified that her next child is Erika, who was born when appellant was 19. Erika is in her father's custody. According to appellant, Pernell is the next child, who was born when appellant was either 20 or 21. Appellant explained that Devonta was born a year later. Bernell W. is the father of both boys. Bernell has established paternity but has not paid child support. When appellant met Bernell, they were both involved with drugs and alcohol. Both Pernell and Devonta were born addicted to cocaine. According to appellant, Brittany is her next child. Appellant has no idea who Brittany's father is. She was born addicted to cocaine. Appellant explained that Vanity, whose father is Joseph M., was born next. Vanity was born addicted to cocaine as well. Appellant testified that Sharika and Cortasha were born next, in that order. Appellant has no idea who their fathers are. Both were born addicted to cocaine. Finally, appellant testified that she has a baby with Fred. This baby was not born addicted to drugs, and appellant testified that she has been off of drugs for two years. Appellant stated that she met Fred when they lived in the same transitional housing as part of a drug treatment program.
 {¶ 55} Appellant testified that she began using marijuana when she was 13 and cocaine when she was 19. She indicated that she had been through several drug treatment programs but was not successful in getting off of drugs until 2000. She relapsed in 2001, and then got off of drugs completely and has not used since. She testified as to three or so former jobs, indicating that she had worked as recently as 2002. At the time of the hearing, she was not employed and Fred was supporting her.
 {¶ 56} Next, appellant discussed the allegations against Fred. Appellant admitted that she was sexually abused at the age of 7, but she did not believe that Fred was a sexual offender. In terms of his history with the agency, appellant stated that she did not believe the allegations because Fred was never convicted. When asked about his California conviction, she explained that Fred told her that this was for oral sex. She did not question him any further. She admitted knowing that if she maintained a relationship with Fred that LCCS would no longer seek to reunify her with her children, but she "trust[ed] God that everything [would] work out."
 {¶ 57} Katherine Carroll, appellant's counselor from Catholic Charities, also testified. She treated appellant from September 2002 to January 2003, seeing her weekly for a total of approximately 16 sessions. Carroll worked with appellant to deal with appellant's sexual abuse as a child and to help appellant with a plan to prevent a relapse. Appellant was off of drugs the entire time she worked with Carroll. She testified that at times appellant felt overwhelmed, helpless, and desperate about her situation. When asked what she knew about Fred, Carroll testified that she never met him, but she had spoken with an LCCS employee who told her about the allegations against Fred (sexual abuse of a child). Finally, she testified that she did not think that appellant was through with counseling and would not be in the near future.
 {¶ 58} On cross-examination, when asked whether she would recommend that the children be reunified with appellant, Carroll responded that she thought appellant was capable of being a good mother but that she was not in a position to say whether appellant should be reunified with them. Carroll had never seen appellant with the children. Carroll also testified that she closed her case with appellant in September 2003, because appellant failed to come to four appointments. She testified that a couple of times appellant called when she missed an appointment and explained that her housing situation was uncertain — that she was in the process of moving. However, at the time the case was closed, Carroll believed that appellant still needed counseling.
 {¶ 59} The subject then turned to Fred. Carroll indicated that appellant seemed to realize the trouble that her relationship posed to the reunification process; however, appellant did not believe the allegations against Fred. In terms of her past victimization, appellant expressed a concern that her children not have the same experience that she had, and she worried about her children living apart from her and about their vulnerability.
 {¶ 60} Next, Candace Perrin testified. Perrin is a TASC case manager and she worked with appellant from November 2002 to January 2003, when appellant went through Drug Court. Perrin spelled out the requirements that participants in drug court must meet: They must report to drug court; they must provide random urine screens; they must attend 12-step meetings; and they must follow through with their LCCS case plan, their mental health plan, their substance abuse case plan, and their housing case plan. Appellant did all of these things. Appellant also had a relapse-prevention plan in place. According to Perrin, appellant successfully completed all aspects of Drug Court except that she violated LCCS's safety plan. She described appellant's dedication to completing services as "very, very high." Perrin agreed that appellant's two-year sobriety commitment was significant, and she testified that at the time appellant completed her program with Drug Court, she appeared to be committed to staying drug-free.
 {¶ 61} On cross-examination Perrin explained that the team professionals working with appellant had recommended that appellant be reunified with the children, at least up until the time appellant violated the safety plan. According to Perrin, "[appellant's] success was on the money." After Fred entered the picture, Perrin advised appellant that a continued relationship with him was against appellant's interest because she had not been sober long enough and because it would violate the safety plan.
 {¶ 62} Jennifer Weiderhold also testified. She is the clinical therapist who ran the depression and anxiety group at Unison that appellant attended. According to Weiderhold, appellant seemed committed to the program, having attended nine out of ten sessions. (Eight out of ten was the minimum number to successfully complete the course.) Appellant started this program in January 2001. Although appellant successfully completed the depression and anxiety group, Weiderhold also believed that appellant needed to work on issues surrounding appellant's childhood sexual abuse.
 {¶ 63} On cross-examination, Weiderhold explained that she informally recommended that appellant attend Unison's AMAC group. Weiderhold indicated that if adults do not address childhood sexual abuse they may suffer from depression and have trouble as adults with relationships, especially sexual relationships.
 {¶ 64} Next, Brenda Davis, Pernell's therapist, testified. At the time of the hearing, she had been treating Pernell off and on for two years. She testified that when she initially saw Pernell, he was "defiant," "anxious," and "disruptive in school." He also had a problem with lying and stealing. Over the course of two years, however, Pernell has improved greatly and now enjoys school, receiving mostly As and Bs, is socially active, and enjoys performing in plays.
 {¶ 65} Davis testified about Pernell's relationship with his mother. She indicated that she saw appellant with Pernell once, and they seemed to have a warm relationship. Pernell reported that he loves his mother and does not blame her for his family's problems. He would like to go back to live with her as he enjoys spending time with her and they have fun together. Davis testified that she was treating Pernell around the time of the July 2002 reunification, and Pernell was happy and excited about going home. When he was placed back in the foster home, Pernell was angry and confused but adjusted quickly. (Pernell is in a separate foster home with a foster mother named Denise.)
 {¶ 66} Davis also discussed Pernell's feelings about Fred. Pernell told Davis that he liked Fred but has not seen him in a year and a half. He and Fred spent time watching TV together. There was also much discussion about Fred giving money to Pernell. Pernell told Davis that Fred had given him small amounts of money on several occasions. He received this money from his mother at visitations, and his mother told him that the money was from Fred. Given the allegations about Fred, Davis is concerned about Pernell receiving money from him. Her concern is that Fred is "grooming" Pernell and if Pernell were to move back home, this would not be a positive environment for him.
 {¶ 67} Davis identified Pernell's initial problems (feeling anxious, being defiant and disruptive, lying and stealing) as coming from two things: instability in his mother's home and anger at having been removed from his home. Davis indicated that Pernell needs a home where there is consistency and stability and where he feels valued by a parent figure.
 {¶ 68} There was much more discussion on cross-examination about "grooming." Davis explained that this is a clinical term that "usually means prepping a child to get comfortable around you, whether it be gifts, money, attention, combing their hair, buying them clothes to get close to them so that there is trust and rapport." Davis indicated that when she asked Pernell why he liked Fred, Pernell responded that Fred gives him money. (However, she later testified that Pernell also reported liking Fred because they spent time together watching TV or just sitting around and talking.) Though Davis had concerns about the money, she did not suggest that it stop because she was comfortable that Pernell was not having direct contact with Fred. Given the allegations about Fred, Davis testified that she would not "take a chance" with any child in "that type of home."
 {¶ 69} According to Davis, Pernell feels comfortable in his foster home; he likes his foster mother, he likes being responsible for chores, and he likes that his foster mother is "spiritual." He has been there approximately three years. If LCCS were granted
 {¶ 70} permanent custody, however, Pernell would be placed with his siblings in Annette's home. Pernell has reported to Davis that he does not want to go there — that he does not feel comfortable around Annette. He reported that Annette does not talk to him. However, he has also reported having fun visiting in Annette's home and seeing his siblings.
 {¶ 71} Next, appellant testified on her own behalf. She denied ever striking or attempting to strike her children or giving them bruises, explaining that she does not believe in corporal punishment. She denied telling Brittany that the family's situation was Brittany's fault and telling Brittany that the foster mother did not love them and was only interested in the money. She denied ever swearing in front of the children and states that she does not ever yell at them. She also denied that she ever had a woman (whom caseworkers thought to be a drug user) living with her. Appellant testified that Brittany is teased at her school about her matted hair and her poor hygiene. Appellant has taken to fixing the children's hair when she sees them for visitation. She also indicated that neither Brittany nor Devonta like school because they are the only African-American children.
 {¶ 72} Appellant also discussed the progress she has made from following through with her case plan. She has learned much about parenting through the parenting program and does not feel overwhelmed by the children; she has been drug-free for over two years; and she regularly attends church, has a sponsor, and attends meetings for a 12-step group three or four times a week. According to appellant, while she feels stress as a result of this litigation, she deals with it by talking to her sponsor and at her group meetings. She has not missed visitation except when she was in the hospital. Appellant believes that she is now capable of being a loving mother who can protect her children.
 {¶ 73} Appellant discussed at length the situation with Fred. She testified that after Kim Shields told her about the allegations against Fred, appellant asked Fred about it and Fred said that LCCS had never interviewed him about the allegations. She also said that she did not learn of the California warrant out for Fred or about the California conviction for "oral copulation" until five months after she married Fred. She testified that when she asked Fred about this conviction, he told her that it was for having oral sex with another adult. She acknowledged that maintaining a relationship with Fred might jeopardize reunification with her children, but she decided to go ahead with the relationship, reasoning that she had already completed everything required in her case plan and Fred was not convicted of the child abuse charges. (She did admit knowing that Fred had been in a relationship with the mother of the alleged child victim.) She testified that Fred had never harmed her children and her children never expressed any fear of him. Appellant also denied that Fred sent money for Pernell.
 {¶ 74} Appellant discussed previous testimony that Vanity had engaged in provocative dancing. Appellant testified that Annette, the girls' and Devonta's foster mother, had allowed Vanity to watch a PG-13 cheerleading movie where the cheerleaders danced provocatively, and Vanity was imitating the girls in the movie. (Joyce Ransom had also testified that Vanity had been allowed to watch this movie at Annette's house.)
 {¶ 75} Finally, appellant testified that she sees the children for visitation about once a week for two hours at a time. During this time, she helps them with their grooming and their homework, they watch videos, and she cooks for them.
 {¶ 76} On cross-examination, appellant admitted that she had only been drug-free about one month when she began a relationship with Fred. When asked about Perrin's recommendation that people be sober for a year before starting a relationship, appellant testified, "They advise quite a few people to do that, but who all goes by that, though"? Appellant was also asked about her belief that Fred served four or five years of time in California for oral sex. When asked if she thought it strange that someone would serve time "just for having oral sex," appellant responded, "Excuse me, but I do not know the law there."
 {¶ 77} Kim Shields, appellant's original LCCS caseworker, was called again to testify on rebuttal. She testified that appellant threatened her over the phone in October 2001, saying words to the effect that "I [meaning Shields] better never look at her again or she was going to knock my ass out." According to Shields, that was just one example of appellant's verbally aggressive behavior toward her. She also testified that appellant admitted to being involved in a physical fight with Vanity's father's girlfriend, and the girlfriend required medical treatment. According to Shields, appellant also threatened residents at Aurora House. Finally, Shields testified that Annette, the foster mother, now has an African-American mentor to help her learn how to deal with the special grooming needs of African-American children.
 {¶ 78} On cross-examination, Shields admitted that, despite her experience with appellant's aggressiveness, she never put anger management into appellant's case plan. According to Shields, this need was addressed in other areas of the case plan — developing coping skills and responding to stress in an appropriate manner. When asked what her concern was about appellant's anger management, Shields responded that appellant "has the propensity to go off." Shields testified that she believes appellant could "go off" on the children, and the children have, in fact, reported to her that their mother has hit them.
 {¶ 79} Finally, Veronica Scharfy, the children's guardian ad litem, testified. Scharfy indicated that she had been in the foster mother's home and witnessed the interaction between the children and Annette. Scharfy described the home as "normal" and "pretty ordinary considering all of the children." She also indicated that, though she was not in the home very long, the interaction between Annette and the children was "fine." Scharfy did not see any problems. She also testified that, as she indicated in her report, she strongly recommends that LCCS receive permanent custody of the children.
 {¶ 80} Following the hearing, the trial court issued a judgment entry in which it found by clear and convincing evidence that the children cannot and should not be placed with either parent, citing R.C. 2151.414(E)(1), (4), and (16). The court also found that, pursuant to R.C. 2151.414(D), granting permanent custody to LCCS was in the children's best interests. Appellant now appeals, setting forth the following assignments of error:
 {¶ 81} "A. The Trial Court erred in admitting hearsay evidence in violation of the Ohio Rules of Evidence.
 {¶ 82} "B. The Trial Court erred when it found by clear and convincing evidence that permanent custody of the child [sic] should be awarded to Lucas County Children's Services Bureau pursuant to O.R.C. 2151.414(E)(1)[,] (4) and (16).
 {¶ 83} "C. Appellant was deprived of a fair trial due to ineffective assistance of counsel, specifically the failure to object to hearsay testimony."
 {¶ 84} In her first assignment of error, appellant argues that the trial court improperly admitted Exhibit 2, which was a copy of LCCS's "history" on Fred. This exhibit outlined the allegations made by the child victim to an LCCS investigator. These allegation of sexual abuse were substantiated by physical examination. The LCCS investigator who created this document was not called to testify. Appellant contends that it is impermissible hearsay.
 {¶ 85} A trial court has discretion to determine which evidence to admit or exclude at trial, and such decisions may not be reversed absent an abuse of discretion. State ex rel. VanDykev. Pub. Emps. Retirement Bd., 99 Ohio St.3d 430, 2003-Ohio-4123, at ¶ 43. The Supreme Court of Ohio has stated that "the term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, quoting State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 86} Hearsay is defined in Evid.R. 801(C) as follows:
 {¶ 87} "`Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."
 {¶ 88} "Statement" is defined in Evid.R. 801(A) as follows:
 {¶ 89} "A `statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion."
 {¶ 90} The first question is whether Exhibit 2 is hearsay. Certainly, it is a statement made by someone other than the declarant. However, the statement was not offered "to prove the truth of the matter asserted." Evid.R. 801(C). The statement was offered to show why LCCS had concerns about Fred and why the safety plan and nocontact order were put into place. It was not offered to prove that Fred committed these acts; it was only offered to prove that there were allegations against him. Therefore, we find that Exhibit 2 was not hearsay. See, e.g., Inthe Matter of: Shetoya E. (Dec. 8, 1995), 6th Dist. No. L-95-095 (allegations of abuse not offered for the truth of the matter asserted are not hearsay).
 {¶ 91} Even assuming that Exhibit 2 is hearsay, we cannot say the trial court erred in admitting it. Evid.R. 803(6) provides an exception to the hearsay rule for business records. That rule provides:
 {¶ 92} "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
 {¶ 93} Appellant's attorney objected to admission of Exhibit 2 on the ground that it "was not established as a document that is maintained under the business rule exception of the business rule hearsay. And no one actually put that document together to testify as to its authenticity, so on that basis alone we would object." In her appellate brief, appellant contends that this document was neither certified nor supported by a person with knowledge of the alleged incident. She also contends that the custodian did not testify as to the authenticity of Exhibit 2.
 {¶ 94} The business records exception does not require that the custodian testify as to the document's authenticity. All that is required for foundational purposes is the testimony of a witness with a "working knowledge of the specific record-keeping system that produced the document." State v. Davis (1991),62 Ohio St.3d 326, 342, rehearing denied (1992), 62 Ohio St.3d 1509, certiorari denied (1992), 506 U.S. 803. Thus, in Davis, an Ohio police officer could not lay the foundation to admit records kept by the Illinois prison system. Id. at 343. In this case, Exhibit 2 was created by an investigator for LCCS, and Shields, another LCCS employee, recognized the document as a permanent record of LCCS ordinarily done whenever allegations of sexual abuse are made and investigated. Shields, herself, has prepared such documents, and she testified that it appeared to be an accurate copy. Similarly, Joyce Ransom, an LCCS employee, testified that Exhibit 2 is a common document in the agency, that these documents are created at or near the time of the investigation, that they accurately report the investigator's findings, and that other LCCS employees routinely rely on them as being accurate. Therefore, we find that Exhibit 2 is a business record and as such is an exception to the hearsay rule.
 {¶ 95} Appellant also contends that Exhibit 2 should not have been admitted because the trial court did not comply with Evid.R. 807. Appellant is raising this argument for the first time on appeal. The general rule in Ohio is that when an attorney makes a specific objection at trial, he or she waives all other objections and cannot raise new ones on appeal. State v. Cahill
(Dec. 31, 1990), 10th Dist. No. 90AP-404, appeal dismissed (1991), 60 Ohio St.3d 702, citing Johnson v. English (1966),5 Ohio App.2d 109, 113. Here, appellant's attorney objected to Exhibit 2 on the basis of Evid.R. 802 and Evid.R. 803; on appeal appellant's attorney raises Evid.R. 807. Therefore, any argument based on Evid.R. 807 is not properly before the court. Nevertheless, we shall address this argument under the plain error standard of review. See Goldfuss v. Davidson (1997),79 Ohio St.3d 116, syllabus (plain error may be applied in civil cases involving "exceptional circumstances.")
 {¶ 96} Evid.R. 807 provides a hearsay exception for out-of-court statements made by a child under the age of 12 when certain procedures are followed. However, Evid.R. 807 is simply an additional hearsay exception; it need not be applied if the trial court finds that another exception applies. See Author's Comments to Evid.R. 807; State v. Dever (1992),64 Ohio St.3d 401,414, rehearing denied (1992),65 Ohio St.3d 1422, certiorari denied (1993), 507 U.S. 919;In re: Samantha Swisher (Apr. 23, 1997), 9th Dist. No. 17952. Here, the trial court heard objections under the business records exception and overruled them. Therefore, since the trial court found that Exhibit 2 was admissible under the business records exception, it did not need to consider whether Exhibit 2 was admissible under Evid.R. 807. Since we have already held that the trial court properly admitted Exhibit 2 under the business records exception, we need not consider Evid.R. 807 at all.
 {¶ 97} Appellant also contends that, even if Exhibit 2 is not considered hearsay, it should have been excluded pursuant to Evid.R. 403(A), which provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Exhibit 2 was probative of the fact the LCCS had cause to be concerned about Fred and that appellant disregarded these concerns even though doing so might jeopardize reunification with her children. To the extent that appellant is arguing that this evidence prejudices Fred, this is irrelevant as Fred is not a party to this action. To the extent appellant is arguing that this evidence prejudices her, we cannot say that the danger of prejudice "substantially outweighs" the probative value of the evidence. Appellant's first assignment of error is found not well-taken.
 {¶ 98} Appellant contends in her third assignment of error that trial counsel was ineffective in failing to object to Shields' testimony about Exhibit 2. The Supreme Court of Ohio has held that courts should apply a two-part test to determine ineffective assistance claims. According to the Supreme Court:
 {¶ 99} "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v.Bradley (1989), 42 Ohio St.3d 136, at paragraph two of the syllabus, certiorari denied (1990), 497 U.S. 1011, citing Statev. Lytle (1976), 48 Ohio St.2d 391, vacated in part (1978),438 U.S. 910; Strickland v. Washington (1984), 466 U.S. 668, rehearing denied (1984), 467 U.S. 1267.
 {¶ 100} The court must defer to the strong presumption that counsel's performance falls within the wide range of reasonable professional performance. Bradley, 42 Ohio St.3d at Even if counsel's performance falls outside the objective standard of reasonable representation, the court shall not reverse unless counsel's ineffectiveness resulted in prejudice. Id. In order to show prejudice warranting reversal, the defendant must show that there is a reasonable probability that, but for counsel's ineffectiveness, the outcome of the proceeding would have been different. Id., quoting Strickland, 466 U.S. at 694.
 {¶ 101} Because we find that Exhibit 2 was properly admitted, we cannot say that trial counsel was ineffective in failing to object to testimony about it. Appellant's third assignment of error is found not well-taken.
 {¶ 102} Appellant makes essentially a manifest weight argument in her second assignment of error. Specifically, she contends that the trial court erred in finding clear and convincing evidence to support findings under R.C.2151.414(E)(1), (4), and (7).
 {¶ 103} R.C. 2151.414(B)(1) provides:
 {¶ 104} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 105} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies
 {¶ 106} for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 107} "(b) The child is abandoned.
 {¶ 108} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 109} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 110} "* * *."
 {¶ 111} In this case, the trial court noted that it was proceeding under under R.C. 2151.414(B)(1)(d). However, since the trial court also recited the language from R.C. 2151.414(B)(1)(a) that the children cannot and should not be placed with either parent and that permanent custody to LCCS is in the children's best interest, we shall discuss that section as well.
 {¶ 112} R.C. 2151.414(B)(1)(a) requires the court to make two findings: (1) that a grant of permanent custody to the agency is in the child's best interest, and (2) that the child cannot or should not be placed with either parent within a reasonable period of time. In order to find that a child cannot or should not be placed with either parent within a reasonable period of time, a court must make a finding under R.C. 2151.414(E). In this case, the court made findings under R.C. 2151.414(E)(1), (4), and (16). Those sections provide:
 {¶ 113} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 114} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 115} "* * *.
 {¶ 116} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 117} "* * *;
 {¶ 118} "(16) Any other factor the court considers relevant."
 {¶ 119} As noted in the statute, a court's findings under R.C. 2151.414(E) must be supported by clear and convincing evidence. The Supreme Court of Ohio has held that clear and convincing evidence is:
 {¶ 120} "that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 121} In addition to finding that the child cannot be placed with a parent within a reasonable period of time, before granting permanent custody to a children's services agency the court must also find that doing so is in the best interests of the child. R.C. 2151.414(D) lists the factors the court shall consider in order to determine the best interests of the child. That section provides:
 {¶ 122} "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 123} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 124} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 125} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 126} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 127} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 128} "* * *."
 {¶ 129} The court made findings under R.C. 2151.414(E)(1) and (4) because appellant's choice to maintain a relationship with, and later marry, Fred was a choice that put her children at risk; also, in making this choice, she put her own needs and desires above those of her children. The trial court stated:
 {¶ 130} "[N]otwithstanding the substantial completion of [appellant's] case plan services, her choice of Mr. Fred [H.] as her current husband prevents the safe return of these children to her home. This information was shared with [appellant], however she fails to see this as a safety threat to her children. Again, [appellant's] actions demonstrate a lack of commitment to her children.
 {¶ 131} "On October 7, 2002, two years after the children first came into the temporary custody of LCCS[, LCCS] filed a Motion for Permanent Custody. LCCS has tried to reunify these children on two occasions with [appellant], however, both times, [appellant's] actions have put her children's safety at risk.
 {¶ 132} "[Appellant] participated in parenting classes. LCCS offered [appellant] a comprehensive intensive interactive parenting class. [Appellant], however, failed this class. [Appellant] did not show sound judgment, nor did she show empathy toward her children. [Appellant's] actions have consistently shown her inability to put her children's need before her own."
 {¶ 133} The trial court also noted appellant's failure to fully address her past sexual abuse. Failure to address these issues, according to counselors who testified, can impact appellant's ability to protect her children from abuse and to form healthy adult relationships. Also important to the trial court was the fact that appellant violated the "spirit of the no contact" order, which showed a "lack of commitment to the needs and safety of her children."
 {¶ 134} In terms of the best interests of the children, the court noted that, despite their substantial needs, the children have thrived in foster care and that they need placements that offer structure and consistency which, according to the court, appellant has not been able to provide. The court also noted the custodial history of the children (that they have been in the temporary custody of LCCS since October 2000) and the availability of a suitable adoptive home where the children can live together.
 {¶ 135} We find that the evidence clearly and convincingly supports the trial court's findings that the children cannot or should not be placed with appellant. Appellant has made choices that show her lack of commitment to the children and her inability or unwillingness to provide a permanent, stable home for them. First, appellant was advised that entering into any romantic relationship within the first year of sobriety was unwise because it could jeopardize her recovery. Appellant acknowledged being told this but entered into the relationship with Fred anyway. If her recovery was unsuccessful, the plans for reunification were in danger.
 {¶ 136} Second, the choice of Fred for a boyfriend, and later as a husband, also showed poor judgment and a lack of commitment to the children. There was evidence that Fred was convicted of some unspecified sexual offense in California and that there were allegations against him in Ohio. Appellant chose not to distance herself from Fred and in fact allowed contact between Fred and the children because the allegations in Ohio were never proven. Whether they were proven or not, the allegations themselves caused LCCS to be concerned enough about him to put the safety plans into place and to seek a no-contact order from the court. By allowing her children to come into contact with Fred and by later marrying him, appellant showed a cavalier disregard for the potential risk that Fred posed for her children. Even if appellant disbelieved the allegations, she knew that continuing her relationship with Fred would jeopardize reunification with her children. She chose to continue the relationship anyway, even though reunification was imminent. When plans for reunification were derailed, the children suffered. One might say that appellant chose Fred, a man she had known for a short time, over her children. All of this shows a lack of commitment to her children and "an unwillingness to provide an adequate permanent home for the child[ren]." R.C. 2151.414(E)(4). This is true despite the many and varied services that LCCS provided to appellant.
 {¶ 137} The evidence also showed that appellant never fully addressed her past sexual abuse despite the urging of several caseworkers and mental health professionals. Again, appellant's failure to fully address these issues shows a lack of commitment to her children.
 {¶ 138} In terms of the best interests of the children, the children clearly love their mother and would like to return home. However, their guardian ad litem does not believe that doing so is in their best interests. All of the children, except for Pernell, are reported to have a good relationship with their foster mother, Annette (who is also their prospective adoptive mother). Pernell has some misgivings about Annette, but he has never lived with her. The children have been in foster care for well over 12 months, and they are doing well there. They need a secure placement, and permanent custody to LCCS would facilitate this. We find that the evidence clearly and convincingly supports the trial court's findings that the children cannot or should not be placed with appellant and that permanent custody to LCCS is in their best interests. The second assignment of error is therefore found not well-taken.
 {¶ 139} We cannot and do not ignore the fact that our decision is tragic for appellant. We do not reach our decision lightly. However, our main focus here is not on the mother but on the children. We have read and considered the dissent, which, in our opinion, focuses more on the mother than on the needs of the children. Our concern is the best interests of the children and whether clear and convincing evidence supports granting permanent custody to LCCS.
 {¶ 140} The dissent emphasizes that the allegations of child sexual abuse against Fred were unproven. Clearly, they were. However, we do not need to decide whether the allegations against Fred are true. Fred is not on trial. Our focus is on appellant's actions in the face of the allegations and what those actions say about her commitment to her children and her ability to provide a permanent and stable home for the children. In our view, refusing to recognize even a potential for sexual abuse shows appellant's lack of commitment to her children. In appellant's case, the potential is even greater given that appellant never fully addressed her own childhood sexual abuse, possibly making her less capable of protecting her own children from a similar danger.
 {¶ 141} The dissent also states that LCCS canceled its plans to reunify this family based on hearsay and allegations. This is not true. LCCS canceled its plans for reunification because appellant disregarded the safety plans and allowed her children to have contact with Fred. That the safety plans were based on allegations cannot be denied. However, LCCS, a public agency charged with protecting children, cannot be expected to do nothing under these circumstances until a conviction for the Ohio allegations was obtained. It was, contrary to the dissent's conclusion, reasonable to effect the safety plans until the allegations could be proved or disproved. It was not, however, reasonable for appellant to completely ignore the allegations, especially given the fact that she had known Fred for less than a year at the time she signed (and then violated) the safety plans. We conclude that the evidence clearly and convincingly establishes that the children cannot and should not be placed with appellant. And, given that the children are doing well in their permanent placement and that they have a great need for permanency and stability, we find that the evidence clearly and convincingly shows that permanent custody to the agency is in the children's best interests.
 {¶ 142} On consideration whereof, we find that substantial justice was done the party complaining, and the decision of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the court costs of this appeal.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Lanzinger, J. Concur.
Arlene Singer, J., dissents.