[Cite as *State v. Williams*, 2024-Ohio-6026.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                          :

      Plaintiff- Appellee,                    :

                                         No. 113788

v.                                                     :

JEROME PIERCE WILLIAMS,                                 :

      Defendant-Appellant.                    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 26, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-680516-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sarah J. Denney, Assistant Prosecuting Attorney, *for appellee.*

Goldberg Dowell & Associates LLC and Adam Parker*, for appellant.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Defendant-appellant, Jerome Williams, appeals his convictions for rape and kidnapping.  He raises five assignments of error for our review:

1. The trial court erred in excluding non-hearsay out-of-court statements.

2. Trial counsel rendered ineffective assistance by failing to impeach the victim with her prior statements.

3. The trial court erred in admitting evidence of appellant's character.

4. The trial court violated appellant's right to be present during jury trial.

5. Appellant's convictions were against the manifest weight of the evidence.

{¶ 2} After review, we disagree with Williams that the trial court erred when it excluded extrinsic evidence of the victim's purported statement because the victim's statement was hearsay and no exception applied. And even if we agreed with Williams that his counsel was ineffective for failing to use the recorded statement to impeach the victim when cross-examining her, defense counsel's deficient performance did not prejudice Williams.

{¶ 3} We further conclude that the trial court did not err when it permitted the victim to testify to prior abuse by Williams because it was relevant to establish the victim's fear of Williams. We also find that the trial court did not violate Williams's right to be present on the morning of the second day of trial because Williams's tardiness in getting to court that morning was a voluntary relinquishment of his right. Finally, we do not agree with Williams that this is the exceptional case in which the evidence weighs heavily against his convictions.

{¶ 4} Accordingly, we overrule Williams's assigned errors and affirm his convictions.

## I. Procedural History and Facts

{¶ 5} Williams was indicted in April 2023 on four counts: Count 1, kidnapping in violation of R.C. 2905.01(A)(4), a first-degree felony with a sexual-motivation specification; Counts 2 and 3, rape in violation of R.C. 2907.02(A)(2), first-degree felonies; and Count 4, intimidation of a crime victim or witness in violation of R.C. 2921.04(B)(1), a third-degree felony. Williams pleaded not guilty to the indictment and waived his right to a jury trial. The following facts were presented to the bench.

### A. Bench Trial

{¶ 6} M.F. and Williams were in a relationship from approximately 2012 until April 2019. They moved in together within four to five months after they began dating and had a daughter together the following year. M.F. stated that their relationship began "to get rocky" when she learned that Williams impregnated another woman around the same time that she became pregnant. Williams's son with the other woman was born three weeks before Williams and M.F.'s daughter was born. When M.F. found out that Williams had been with the other woman, she was upset but she chose to stay with him.

{¶ 7} M.F. testified that she and Williams had problems during most of their relationship. M.F. said that Williams was "controlling." She explained that he did not want her to leave the house, he did not want her to have friends, and he would constantly look through her phone. M.F. said that Williams would physically abuse her if he saw that she had been talking to someone on her phone.

**{¶ 8}** M.F. briefly moved out of the home she and Williams shared in the summer of 2017. She said that she did so because Williams punched her in the face in front of their daughter and Williams's son. She temporarily moved in with a friend whom she used to date. M.F. stated that after she moved back in with Williams, things got worse between them. Williams was angry that she stayed with a male friend, and Williams continued to look through her phone.

**{¶ 9}** In April 2019, M.F. stated that she left Williams for good. She said that they had been fighting a lot because Williams had been spending time with his son's mother. The last straw occurred when M.F. overheard a conversation that Williams was having with the other woman about getting back together with her. M.F. moved in with her mother and took her daughter with her.

**{¶ 10}** M.F. said that after she moved in with her mother, she began a relationship that same week with another man. She was still in a relationship with the other man at the time of trial.

**{¶ 11}** M.F. said that she and Williams did not have a formal visitation agreement, but she would still allow Williams to spend time with their daughter anytime he wanted to see her. She said that she never tried to keep their child away from Williams.

**{¶ 12}** On May 28, 2019, M.F. asked Williams to watch their daughter because she had to work. Williams agreed to watch her and asked M.F. to bring him batteries for his gaming controller when she brought their daughter to his house. M.F. said that when she got to Williams's house, their daughter ran into the house.

M.F. stated that she got out of her car to give Williams the batteries. When she did, Williams took her phone out of her hand and began looking through it. M.F. testified that after looking at her phone for a short time, Williams "snatched" her and dragged her to the basement of the home.

{¶ 13} Once they were in the basement, M.F. said that Williams removed her pants and pushed her onto an ottoman and that is when he "started sexually assaulting" her and "that's when he penetrated [her]." She testified that she was screaming and telling him to get off her. M.F. tried to push Williams off her but could not do so. She remembered Williams telling her, "You're mine. You will always be mine." Williams then moved her to another area of the basement where the washer and dryer were, "and he turned [her] around, and had [her] against the washer or dryer," penetrated her again, and then "he finished." She explained that by "finished" she meant he ejaculated in her vagina.

{¶ 14} M.F. stated that when Williams "finished," he was "just standing there" and did not try to grab her, so she picked up her pants and ran out of the house without putting them on.

{¶ 15} M.F. called her sister first to ask her if she could pick up her daughter at Williams's home. She told her sister what happened, and her sister told her to call the police. She then called her boyfriend and was "screaming in the phone." She told him what happened, and he also told her to call the police. She drove to the police station when she got off the phone.

{¶ 16} While at the police station, M.F. said that she asked the police to turn off their body cameras. She said that she did so because she was scared and "at the time, [she] knew [she] wasn't going to go forward with anything or tell them to go get him." She said that she was still trying to process what happened and was embarrassed and humiliated. She also wanted their child to still be able to see Williams. She said that at that time, she still cared for Williams, so she was reluctant to get him in trouble. When she left the police station, she went to the hospital and received a sexual assault examination.

{¶ 17} M.F. testified that when the police called her to follow up on the case, she did not return their calls. She explained that she "was just trying to sweep it under the rug" and move forward for their child's sake. She continued to talk and text with Williams because she was trying to coparent with him. She did not want her daughter to grow up without a father.

{¶ 18} But in October 2021, M.F. said that she reached out to the police because she was ready to pursue the charges against Williams. M.F. explained that she was tired of dealing with Williams. She said that she was also having flashbacks and was not sleeping. She discussed the case with her mom, sister, and boyfriend. She realized that she had "finally come to terms with what happened, and it wasn't okay." She said that she no longer wanted to protect Williams or sweep it under the rug.

{¶ 19} M.F. identified screenshots that she took of Williams sometime in 2020 when she was FaceTiming him. She said that she snapped the screenshots

when Williams showed her a gun and threatened to kill her. The screenshots show Williams with a gun in his hand.

{¶ 20} M.F. stated that she has not been doing well since the sexual assault happened. She said that it affects her life "[i]n every way," including her sleep, sex life, and how she raises her daughter. She also had cameras installed on her home and checks them four to five times each night.

{¶ 21} M.F. agreed on cross-examination that when she and Williams were still together, she threatened to "scar" him when he was going to visit his son in Columbus. She also agreed that she and Williams had "sexual relations" five days before the rape occurred. She denied that she was following through with the rape charges because she wanted to get back at Williams.

{¶ 22} M.F.'s mother testified that on May 28, 2019, she received a text from M.F. saying that she needed to talk to her immediately. M.F.'s mother said that M.F. came to her place of employment to talk to her. She said that M.F. was "a mess." M.F. had been crying, and her face was "puffy." M.F. told her mother what happened and that she had gone to the hospital.

{¶ 23} M.F.'s mother stated that M.F. changed after the incident on May 28, 2019. M.F. became fearful and nervous and did not want to go anywhere alone. She also said M.F. did not seem to have it "together mentally." M.F.'s mother explained that she and her husband had temporary custody of M.F.'s daughter for a period of time in 2019.

{¶ 24} M.F.'s sister testified that she received a phone call from M.F. on May 28, 2019. M.F.'s sister said that M.F. told her what happened and was upset and hysterically crying. She advised M.F. "to make a report to make sure it was on file just in case anything serious happened." She also told M.F. to go to the hospital "so everything could be documented." She saw M.F. before she went to the police station or hospital. She said that M.F.'s eyes were red and her face was swollen.

{¶ 25} M.F.'s sister said that she was concerned about M.F.'s safety and that was not the first time she had been concerned about M.F. when she was in the relationship with Williams. M.F.'s sister said there had been multiple incidents where she "had been called after-the-fact of their altercations" and "this was just another one on the list."

{¶ 26} Colleen Spinks testified that in May 2019, she was a sexual-assault nurse at University Hospitals. She performed a sexual-assault exam on M.F. on May 28, 2019, and collected evidence for the rape kit. Nurse Spinks stated that M.F. cried at times during the exam and continued to get tearful periodically. M.F. was also quiet, appeared to be tired, and had a "flat affect" at times. Nurse Spinks also documented that M.F.'s vagina was tender, she had redness just below her vaginal opening, and her cervix had "blood-tinged fluids inside."

{¶ 27} Nurse Spinks read the narrative that she wrote as M.F. told her what happened. It stated:

> Jerome is the father of my five-year-old daughter . . . . I had to drop her off at his house, so he could babysit so I could go to work. I pulled in the drive. He was downstairs already at the door and my daughter

ran upstairs to the second floor apartment. He grabbed my phone and he went through it. He went to my text thread of the person I'm talking to now. We have been arguing all year, and I got tired of it, and I finally just left six weeks ago. He was reading the texts out loud, and yelling, and saying that "You're fucking him over me." He was sitting on the steps, and he stood up and, I asked for my phone and car keys back. He said "no." And he pulled my hair, and pulled me by my hair and the back of my neck into the basement. I don't remember much of what he said. I remember saying and telling him to stop and to get off of me. I remember him saying, "You will always be my bitch." He pushed me on the couch. Pulled my pants and underwear off and threw them. He held me down by my shoulders. I was screaming and he told me to shut up. To shut up before the neighbors hear and he shoved it in. It wasn't long and he came. I don't remember what or if he said anything because I was screaming. When he was done, I screamed at him to get off me and I pushed him. He got up, and I got up, and I grabbed my pants, and ran out the front door. My underwear must be still there. He followed me like he did nothing wrong. He wasn't aggressive now. I told him to give me my phone and keys while I was putting my pants on outside next to my car in the driveway. He gave them to me. I left and went to the police station, and made a report. While at the police, I called my sister to get my daughter. She did. After the police, I came here. One of the reasons I left him is because he was starting to lay hands on me, hit me and push me. Today he pulled me by my hair, and grabbed me around the back of my neck to help pull me and push me around.

{¶ 28} Sergeant Alexander Sinclair of the Cleveland Police Department took M.F.'s initial report on May 28, 2019. He wore a body camera when he interviewed M.F. at the police station. The recording was played in court without audio. Sergeant Sinclair stated that M.F. "was pretty hysterical . . . about the whole incident." She was "very emotional" and crying. Sergeant Sinclair said that at one point, M.F. "was very adamant that the camera be turned off." He said that she did not realize that the police would make a report. M.F. thought that "she could explain this whole situation and that nothing would come of it."

{¶ 29} Dennis Bruening testified that he was a police officer for 35 years but is now an investigator for the Cuyahoga County Prosecutor's Office. He works on older sexual assault cases and was assigned to this case in October 2021. He reviewed the previous file in this case and interviewed M.F. He also obtained the medical records from the hospital.

{¶ 30} Investigator Bruening interviewed Williams with his attorney present. Williams denied that he sexually assaulted M.F. He gave Investigator Bruening a video recording of M.F. performing oral sex on Williams that Williams stated occurred on May 23, 2019. Williams provided his DNA, which matched the DNA obtained from M.F.'s sexual assault kit. Investigator Bruening also tried to talk to Williams's son's mother, but she declined to make a statement.

{¶ 31} Investigator Bruening agreed on cross-examination that Williams gave him three video recordings: one was M.F. performing oral sex on Williams, one appeared to be recorded in an airport, and one was a video of M.F. driving a vehicle. Investigator Bruening sent videos to the Forensic Unit, which was not able to determine a date or timestamp for any of the videos.

{¶ 32} Investigator Bruening further agreed that he was not able to verify some of the previous injuries that M.F. had told him about where Williams injured her. But he did confirm that she went to MetroHealth Medical Center in July 2017 with injuries and alleged that Williams had assaulted her. Investigator Bruening stated that M.F. told hospital employees at that time that Williams struck her several times in the head with a BB gun. M.F. did not file charges against Williams in 2017.

{¶ 33} The State rested, and Williams moved for a Crim.R. 29(A) acquittal on all counts. The trial court granted it with respect to Count 4, intimidation of a crime victim or witness, and denied it with respect to the remaining counts.

{¶ 34} Williams testified that he broke up with M.F. in April 2019, and M.F. and their daughter moved out of their home. He said that they were supposed to go to M.F.'s mother's house, but he later learned that M.F. went to stay with her new boyfriend and left their daughter at her mother's house. Although they broke up, he said that M.F. gave him oral sex on May 23, 2019, which he video recorded with his cell phone.

{¶ 35} Regarding what occurred on May 28, 2019, Williams testified that M.F. brought their daughter to his apartment. Williams said that their daughter went into the living room to play with his son, and he and M.F. went to his bedroom and had sex.

{¶ 36} Williams stated that he and M.F. were in the bedroom for seven to ten minutes and M.F.'s phone kept ringing the entire time. Williams said that he could see that the person calling M.F. was a number that he recognized as the same one that had called M.F. many times in April 2019. Williams said that M.F. got angry with him and left after they had sex because he told her that her phone was "going crazy."

{¶ 37} Williams testified that after M.F. left on May 28, he sent the May 23 video of M.F. performing oral sex on him to the number that had been calling M.F.

He said that he did not know whose number it was at the time, but he later learned that it belonged to M.F.'s new boyfriend.

{¶ 38} Williams testified that on June 2, 2019, he recorded a conversation between himself and M.F. where she stated that she still wanted to be with him. Williams testified that he told M.F. that if she still wanted to be with him, she needed to "get the paperwork" to prove that she did not have a sexually transmitted disease. M.F. would not agree to get tested for sexually transmitted diseases, so Williams said that he told her that he would not have sex with her. Williams attempted to introduce the recording into evidence, which he claimed would show that M.F. still wanted to be with him, but the trial court would not permit him to do so after finding M.F.'s purported statement to be hearsay.

{¶ 39} Williams's girlfriend and mother of his son testified that she and Williams first got together in high school. She was still seeing him in 2012 when he started dating M.F., and they continued to see each other until she moved to Columbus in 2017. She was aware that Williams was also with M.F. that entire time. She moved to Columbus for a better life and to get away from a "messy" situation. She said that Williams would come to Columbus every two to three months to visit and would stay at her place. She and Williams got back together in 2020, and he moved to Columbus to live with her in August 2021. They had another child together and were engaged at the time of trial.

{¶ 40} Williams renewed his Crim.R. 29(A) motion for acquittal at the close of his case, which the trial court denied.

**B. Sentence**

{¶ 41} The trial court found Williams guilty of kidnapping with the sexual-motivation specification and both counts of rape. It sentenced him to an indefinite term in prison of six to nine years for kidnapping and a definite term of six years on each of the rape counts, to be served concurrently with one another, for an aggregate prison term of six to nine years in prison. The trial court further notified Williams that he was classified as a Tier III sex offender and informed him of the required notifications related to that classification. It is from this judgment that Williams now appeals.

**II. Law and Analysis**

**A. Hearsay**

{¶ 42} In his first assignment of error, Williams argues that the trial court erred during his direct examination when it excluded extrinsic evidence of the victim's purported statement. Williams states that he recorded the victim making the statement five days after the rape. He claims that in the recording, the victim states that if Williams did not want to be with her, she would find someone else.[1] Before we discuss what occurred during Williams's direct-examination regarding this recording, we will review what occurred during the victim's testimony with

---

[1] At trial, defense counsel attempted to submit three separate video recordings into evidence that Williams purportedly took of the victim. But on appeal, Williams is challenging only the trial court's exclusion of the video that he claims occurred five days after the rape. We will therefore confine our discussion to the recording that Williams is challenging on appeal.

respect to the same recording because it is necessary to understand what fully occurred at trial before analyzing this argument.

## 1. Arguments and Testimony Relevant to the Recorded Statement

{¶ 43} Before cross-examining the victim, defense counsel informed the court that he wanted to submit a video recording into evidence. Defense counsel stated that he had shared the recording with the State prior to trial. The State acknowledged receiving and viewing the recording but objected to it being admitted into evidence. The trial court instructed defense counsel to begin cross-examining the victim and it would rule on the admissibility of the recording when the time came.

{¶ 44} Defense counsel asked the victim during cross-examination if she remembered having a conversation with Williams after the alleged rape. The victim responded that she did not understand the question. Defense counsel informed the court that he wished to play a video recording at that point. Defense counsel and the State discussed the issue at sidebar. According to defense counsel, the recording was a conversation between Williams and the victim that Williams had recorded and which took place approximately five days after the rape. The court informed defense counsel that he could not play the recording to impeach the victim because the victim had not yet denied anything related to the recording. Defense counsel continued its cross-examination of the victim but never again asked the victim another question about this specific recording.

{¶ 45} During Williams's direct examination, defense counsel asked Williams if he had a recording of the victim "where she's still acting like she still wants to be with [him] after" she made the rape allegations. Williams responded, "Yes." Defense counsel asked the court if he could play the recording at that time, and the State objected. Defense counsel and the State had a discussion at sidebar.

{¶ 46} Defense counsel explained that Williams had a recording of himself and the victim talking five days after the alleged rape. According to defense counsel, "[T]here is a recording where he's talking about getting the paperwork like he just said, 'Get the paperwork to show you don't have any disease.' And she's saying, 'No, and if you don't want to be with me no more, I will find another person just like I found you.'"

{¶ 47} The prosecutor disagreed with defense counsel regarding "the sentiment" of the recording. The prosecutor argued that the recording was "inflammatory and there's no basis for playing it." According to the prosecutor, Williams can be heard on the recording talking about getting paperwork but argued that there was no context for what Williams was referring to. The State further argued that even if the "paperwork" referred to the victim getting tested for sexually transmitted diseases, the recording should have come in during the victim's testimony rather than Williams's testimony. The prosecutor also told the court if the recording "actually showed that [the victim] was trying to be with [Williams], he would have played it when the victim testified to impeach her statement that she did

not want to be with him." According to the prosecutor, defense counsel was "trying to play the victim's out of [c]ourt statement for the truth of what [was] in it."

{¶ 48} Defense counsel denied that he wanted to play it for the truth of the matter asserted. He argued that according to his memory, the court would not allow him to play the recording during the victim's testimony. The trial court disagreed. It stated that it instructed defense counsel to ask the victim the questions first and, if the victim said something other than what she said in the recording, then he could play the recording to impeach the victim's testimony. The court then ruled that defense counsel could not play the recording during Williams's testimony because it contained hearsay.

### 2. Hearsay Law and Standard of Review

{¶ 49} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). If the statement was offered for some other purpose, it is not inadmissible hearsay. *State v. Davis*, 62 Ohio St.3d 326, 344 (1991).

{¶ 50} Generally, the decision whether to admit or exclude relevant evidence lies within the trial court's sound discretion. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. However, while the trial court has discretion to admit or exclude relevant evidence, it has no discretion to admit hearsay because Evid.R. 802 mandates the exclusion of hearsay unless any exceptions apply. *State v. Ellison*, 2013-Ohio-4909, ¶ 24 (8th Dist.), citing *State v. Sorrels*, 71 Ohio App.3d

162, 165 (1st Dist. 1991). Thus, we review de novo the trial court's decision regarding whether a statement is hearsay or nonhearsay under Evid.R. 801. *Id.*

{¶ 51} Errors relating to the trial court's admission of hearsay must be reviewed in light of Evid.R. 103(A) and the standard established in Crim.R. 52(A), providing that such errors are harmless unless the record demonstrates that the errors affected a party's substantial right. *Sorrels* at 165. In determining whether an error in the admission of evidence is harmless, the reviewing court must find that there is no reasonable possibility that the evidence contributed to the defendant's conviction. *Id.*

### 3. Analysis

{¶ 52} Williams contends that M.F.'s purported out-of-court statement was not hearsay because he did not offer it for the truth of the matter asserted. Rather, he maintains that he offered it to show M.F.'s motive and intent to lie about the rape and kidnapping.

{¶ 53} After review, we agree with the trial court that the purported statement was hearsay. Although Williams maintains that he did not offer the victim's statement for the truth of the matter asserted, the victim's statement had to be true before it could cast doubt on her motive and whether M.F.'s rape and kidnapping allegations were true. Thus, we find no merit to Williams's argument that he did not offer the statement to prove the truth of the matter asserted

{¶ 54} Williams further argues that even if he offered the statement "for its own truth," the trial court should have admitted it under Evid.R. 803(3), an

exception to the hearsay rule for "then existing, mental, emotional, or physical condition[s]." This exception provides that the following type of hearsay evidence is admissible:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

{¶ 55} Williams maintains that assuming he offered M.F.'s statement for its own truth, "it amounted to a statement of M.F.'s intent and plan . . . to continue a romantic relationship" with him, "unless he no longer wanted to be with her." He contends that this evidence would have been relevant "because her willingness to continue the relationship was probative of the truthfulness of her accusations."

{¶ 56} We disagree. First, we note that Williams failed to argue this exception to the trial court. "'[I]t is a cardinal rule of appellate procedure that a party cannot assert new legal theories for the first time on appeal.'" *State v. Fulton*, 2022-Ohio-4323, ¶ 9 (3d Dist.), quoting *State v. Richcreek*, 2011-Ohio-4686, ¶ 33 (6th Dist.); *see also In re Pernell C.*, 2004-Ohio-5791, ¶ 95 (6th Dist.), citing *State v. Cahill*, 1990 Ohio App. LEXIS 5905, *8 (Dec. 31, 1990 10th Dist.) ("The general rule in Ohio is that when an attorney makes a specific objection at trial, he or she waives all other objections and cannot raise new ones on appeal.").

{¶ 57} But even if we assume for the sake of argument that Williams is correct that the trial court erred when it excluded extrinsic evidence of the victim's

statement, we find that any error in doing so was harmless. The trial court heard other testimony that called the victim's credibility into question, including the fact that she gave Williams oral sex five days before the rape despite testifying that she left him in April 2019, and the trial court still believed her version of what happened over Williams's version.

{¶ 58} Moreover, the trial court heard several witnesses who corroborated the victim's testimony. The victim recounted what Williams did to her to the SANE nurse, which matched the victim's trial testimony of what had occurred. The victim's mother and sister both testified that the victim was upset, crying, and hysterical on May 28, 2019, when she told them what Williams did to her. And the court observed a recording of the victim taken at the police station when she first reported the rape, which showed the victim upset and crying. The police officer who took the victim's initial statement also described the victim's demeanor during the interview as hysterical, upset, and crying. Thus, the trial court heard evidence from several other witnesses that supported the victim's version of the events. We therefore do not agree with Williams that if the trial court had admitted a recording of the victim's purported statement, it would have affected the outcome of the trial.

{¶ 59} Essentially, Williams attempted to get extrinsic evidence of the victim's prior inconsistent statement admitted into evidence through his testimony. When a party would like to offer extrinsic evidence of a prior inconsistent statement into evidence under Evid.R. 613(B), that party must first establish a foundation through direct or cross-examination where all of the following occurs: "(1) the

witness is presented with the former statement; (2) the witness is asked whether she or he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposition party is given an opportunity to interrogate the witness on the inconsistent statement." *State v. Shaffer*, 114 Ohio App.3d 97, 102 (3d Dist. 1996), citing *State v. Theuring*, 46 Ohio App.3d 152 (1st Dist. 1988).  That simply did not occur here.

{¶ 60} Thus, we conclude that the trial court did not err when it excluded extrinsic evidence of the victim purportedly stating that if Williams no longer wanted to be with her, she would find someone else.  And even if we would have agreed with Williams that the trial court erred when it excluded the evidence, any such error was harmless.

{¶ 61} Accordingly, we overrule Williams's first assignment of error.

**B. Ineffective Assistance of Counsel**

{¶ 62} In his second assignment of error, Williams argues that his defense counsel was ineffective when cross-examining the victim because he failed to use the same recording of the victim's prior inconsistent statement — that if Williams did not want to be with her, she would find someone else — to impeach the victim during her testimony.

{¶ 63} A criminal defendant has a right to the effective assistance of counsel. *State v. Ayesta*, 2015-Ohio-1695, ¶ 14 (8th Dist.), citing *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010).  When arguing ineffective assistance of counsel, defendants must establish the two-part test enunciated in *Strickland v. Washington*, 466 U.S.

668 (1984), which requires them to show that (1) counsel's performance fell below an objective standard of reasonableness and (2) they were prejudiced by counsel's deficient performance. *Padilla* at 367. The prejudice prong of the test requires that the defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

{¶ 64} Williams's entire argument within this assigned error is that his counsel's failure to impeach the victim with extrinsic evidence could not have been deliberate trial strategy because his counsel did not play the video because of "technical difficulties in getting the video file to open." We disagree that defense counsel did not play the recording because of technical difficulties. Although defense counsel could not get the recording to play at first, he told the trial court that he could play it for the judge on his laptop. And since there was no jury, playing it on a laptop would have been sufficient. Therefore, technical difficulties did not prevent defense counsel from using the recording to impeach the victim's testimony.

{¶ 65} However, as we explained in the previous section, defense counsel did not use the recording to impeach the victim's testimony because he failed to lay the proper foundation. Specifically, defense counsel failed to ask the victim whether she made a statement to Williams after the rape that indicated she would find someone else if he no longer wanted to be with her. But Williams does not raise the argument

that his counsel was ineffective for failing to lay the proper foundation to impeach the victim.

{¶ 66} And even if Williams had raised this argument, *and* we agreed with him that his counsel was ineffective, we would still find that he was not prejudiced by his counsel's deficient performance. As we explained in the previous analysis, the trial court heard from the victim, her mother, her sister, the SANE nurse, and the police officer who took the victim's statement in May 2019. The trial court also heard testimony that cast doubt on the victim's account of what happened, and yet, it still believed the victim and the other witnesses who corroborated the victim's version of what occurred over Williams's version.

{¶ 67} After review and considering the totality of the evidence presented at trial, we cannot say that Williams established a reasonable probability that, but for his counsel's presumed error in not using the recording to impeach the victim, "the result of the proceeding would have been different." *Strickland* 466 U.S. at 694.

{¶ 68} Williams's second assignment of error is overruled.

### C. Evidence of Defendant's Character

{¶ 69} In his third assignment of error, Williams argues that the trial court erred when it admitted evidence that he had previously physically abused the victim. He further argues that the admission of this evidence was substantially more prejudicial than probative because "evidence of [his] prior misdeeds could reasonably have influenced the court's determination of credibility."

**{¶ 70}** Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character." The evidence may, however, "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 2020-Ohio-4440, ¶ 22.

**{¶ 71}** The Ohio Supreme Court set forth a three-step analysis for courts to determine whether other-acts evidence should be admitted: (1) was the evidence relevant, (2) was the evidence presented for a legitimate purpose under Evid.R. 404(B)(2), and (3) was the probative value of the evidence substantially outweighed by the danger of unfair prejudice. *State v. Williams*, 2012-Ohio-5695, ¶ 19-20. "[T]he inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt[;] [r]ather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered." *Hartman* at ¶ 26. Additionally, "[t]he nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27, citing *Huddleston v. United States*, 485 U.S. 681, 686 (1988).

**{¶ 72}** Therefore, according to *Hartman*, whether the other-acts evidence is relevant under the first step of Williams is dependent upon whether the evidence is offered for a nonpropensity purpose as set forth in the second step of *Williams*, i.e.,

a legitimate purpose for which the evidence is offered, and whether the nonpropensity purpose goes to a material issue in the case. Thus, we will discuss the first two steps together (as the Supreme Court did in *Hartman*). *See Hartman*, 2020-Ohio-4440, at ¶ 24-28.

{¶ 73} The admissibility of other-acts evidence is a question of law that we review de novo. *Id.*, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019). However, if the other-acts evidence was offered for a permissible purpose, then trial courts have discretion regarding whether to admit the evidence after "[w]eighing the probative value of the evidence against its prejudicial effect." *Id.* We therefore review the trial court's decision regarding prejudice for abuse of discretion. *Id.*

**1. Relevance to Nonpropensity Purpose**

{¶ 74} During the victim's direct examination, she testified that Williams physically abused her during their relationship. Williams objected, but the trial court overruled his objection. The trial court stated that the victim was just giving her perspective of their relationship. The State later argued at a sidebar that evidence of Williams's prior abuse of the victim was admissible to show why the victim waited over two years before pursuing charges against Williams; i.e., she feared Williams.

{¶ 75} We will first address Williams's argument that because the State did not inform the trial court of its purpose for offering the other-acts evidence until after the victim had already testified to the physical abuse, the court could not

conduct the necessary analysis to determine whether this purpose was relevant. We disagree.

{¶ 76} One of Williams's defense theories at trial was that the victim was not credible because she waited over two years to pursue criminal charges against him. Defense counsel stated in his opening statement that he wanted the judge, as the trier of fact, to focus on "what happened in the two years and why all of sudden on October 9, 2021[,] would the alleged victim now come forward?" Williams further tried to show through cross-examination of the victim that the victim did not fear him because she continued to let their child spend time with him after the rape. Therefore, the victim's fear was a material issue at trial, and the court was aware of Williams's defense regarding the victim's credibility and delay in pursuing charges against him.

{¶ 77} Courts have held that evidence of a defendant's prior acts of domestic violence against the same victim can be admissible to show motive, intent, and absence of mistake or accident. *State v. Walker*, 2020-Ohio-1581, ¶ 48 (1st Dist.), citing *State v. Nields*, 93 Ohio St.3d 6, 22 (2001). In a bench trial, judges are presumed to know the law and consider only material, admissible evidence. *State v. Thomas*, 2002-Ohio-6624, ¶ 57, citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987); *State v. Primous*, 2020-Ohio-912, ¶ 60 (8th Dist.), citing *State v. Bays*, 87 Ohio St.3d 15, 27 (1999).

{¶ 78} In this case, the victim testified that Williams was very controlling and that she feared him because of the prior abuse. Evidence of Williams's prior abuse

demonstrated the violent nature of the relationship between Williams and the victim. Physical abuse and the control that Williams exercised over the victim were relevant to establishing the victim's fear of Williams, which was relevant to the victim's credibility and why she did not initially want to pursue charges. *Id.* at ¶ 49; *see also State v. Lucas*, 2020-Ohio-1602, ¶ 88-89 (8th Dist.); *State v. Thompson*, 2003-Ohio-3939, ¶ 24 (8th Dist.).

{¶ 79} Williams further argues that the State's nonpropensity reason was not valid because the victim did not testify that one of the reasons she waited two years to pursue charges was her fear of Williams. We disagree. The victim testified that she did not want the police to record her during her initial interview with them in May 2019 because she was scared. She further explained that she did not want the police to record her because she did not want to pursue charges at that time. This was sufficient to establish that one of her reasons for not pursuing charges was fear.

{¶ 80} We therefore conclude that the trial court did not err when it overruled Williams's objection and permitted the victim to testify to Williams physically abusing her in the past.

### 2. Probative Value Versus Unfair Prejudice

{¶ 81} Williams further argues that even if the trial court was permitted to accept the State's "post-hoc rationalization that other-acts evidence was necessary to explain [the victim's] delay in pursuing prosecution," the trial court should have excluded the evidence because it was substantially more prejudicial than it was probative. We disagree.

{¶ 82} The Ohio Supreme Court stated in *Hartman*, 2020-Ohio-4440, that "[b]alancing the risks and benefits of the [Evid.R. 403(B)] evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion." *Id.* at ¶ 30, citing Leonard at Section 4.10. In making this determination, the trial court should consider "the extent to which the other-acts evidence is directed to an issue that is actually in dispute." *Id.* "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases." *Id.* (Emphasis sic.)

{¶ 83} As we previously stated, the victim's fear was a material issue in dispute in this case. Therefore, the probative value was high, which decreased the risk of unfair prejudice. Furthermore, considering the entirety of the evidence presented at trial as we did in the previous assigned error, we also find that the probative value of the victim's testimony regarding Williams's past acts of physical abuse was not substantially outweighed by the danger of unfair prejudice.

{¶ 84} Finally, Williams argues that the State did not provide him with notice prior to trial of its intent to use other acts evidence under Evid.R. 404(B). The State concedes that it failed to provide notice but maintains that the Staff Notes to Evid.R. 404(B) make it clear that the notice requirement "should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice, absent a showing of bad faith." *Brecksville v. Sadaghiani*, 2021-Ohio-2443, ¶ 76 (8th Dist.), citing *State v. Plevyak*, 2014-Ohio-2889, ¶ 21 (11th Dist.). There is

no indication that the State's failure to notify the court and Williams about its intent to use other-acts evidence was done in bad faith.

{¶ 85} Accordingly, Williams's third assignment of error is overruled.

### D. Right to be Present During Trial

{¶ 86} In his fourth assignment of error, Williams argues that the trial court committed structural error when it began the second day of trial without him being present, in violation of his federal and State constitutional rights. He maintains that while he was late to trial on the second day, that did not amount to a voluntarily relinquishment of his right to be present.

{¶ 87} At the beginning of the second day of trial, the judge asked defense counsel why Williams was not present. Defense counsel explained that he spoke to Williams ten minutes previously and Williams said that he would be at court in ten minutes. Defense counsel told the judge that Williams "got caught in rush hour traffic." The judge stated that she was going to issue a capias for Williams's arrest and proceeded with the trial. Defense counsel did not object.

{¶ 88} Because Williams failed to object to the trial court's continuation of trial in his absence, we review for plain error. Under Crim.R. 52(B), plain errors are any "errors or defects affecting substantial rights [and] may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 89} A defendant has a constitutional right to be present, absent a waiver of this right or other extraordinary circumstances, at every stage of his trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *State v. Williams*, 6 Ohio St.3d 281, 286 (1983). "An accused's absence, however, does not necessarily result in prejudicial or constitutional error. '[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*.'" (Emphasis sic.) *State v. Wilks* 2018-Ohio-1562, ¶ 215.

{¶ 90} In Ohio, a defendant's due process right to be present is embodied in Crim.R. 43(A) that states a "defendant shall be present at . . . every stage of the trial." But "the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the verdict." Crim.R. 43(A). In other words, the right to be present at trial may be waived by the defendant's own act.

{¶ 91} The Ohio Supreme Court explained that when defendants are not in custody during trial and they voluntarily do not appear for trial after the trial has begun in their presence, "'this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of [their] right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if [they] were present.'" *State v. Meade*, 80 Ohio St.3d 419, 423 (1997), quoting *Diaz v. United States*, 223 U.S. 442, 455 (1912).

{¶ 92} First, we disagree with Williams that his absence was not voluntary. On the morning of the second day of trial, defense counsel told the court that

Williams got caught in rush hour traffic because he did not know Cleveland very well (at the time of trial, Williams was living in Columbus). But even if that was true, that does not make his tardiness involuntary. *See State v. Carr*, 104 Ohio App.3d 699, 703 (2d Dist. 1995) (Pursuant to Crim.R. 43(A), it is presumed that a defendant who is present at trial knows of his obligation to appear in court throughout the trial proceedings.). Williams knew what time his trial started and had a duty to appear on time. *Id.*; *see also State v. Maynard*, 2012-Ohio-2946, ¶ 42 (10th Dist.) (defendant's absence deemed voluntary when he did not appear in court for trial because he chose to attend the birth of his child instead of appearing for trial); *State v. Spinks*, 79 Ohio App.3d 720, 733 (8th Dist.1992) (defendant's absence deemed voluntary where the record reflected she had attended her son's graduation ceremony rather than the trial proceedings).

{¶ 93} Although it is not clear from the record how long it was before Williams arrived in court on the second day of his trial, his defense counsel informed the court that Williams was only ten minutes away when the trial began. The transcript does not indicate time, but the second day of trial commenced on page 263 of the transcript, and Williams began testifying on his own behalf on page 299. Thus, Williams appeared sometime within those 36 pages of transcript — in a trial that produced nearly 500 pages of transcript. Even considering morning traffic in downtown Cleveland, the amount of time it takes to park and wait for the elevators in the Justice Center, Williams could not have missed much of his trial — certainly not enough to amount to an unfair trial and violation of his constitutional rights.

{¶ 94} Williams acknowledges that Ohio courts have subjected this issue to harmless-error review, but he contends that "in light of more recent United States Supreme Court precedent," we should apply a structural-error analysis. We decline to do so. First, Williams does not cite one case where a court applied a structural-error analysis to this issue. Second, Williams invited this error by being late to his own trial. Third, as we previously explained, Williams's brief absence from his trial did not result in an unfair trial.

{¶ 95} After review, we find no merit to Williams's argument that his constitutional rights were violated on the second day of trial when the trial court began the trial in his absence. Accordingly, we overrule Williams's fourth assignment of error.

### E. Manifest Weight of the Evidence

{¶ 96} In his fifth assignment of error, Williams argues that his convictions were against the manifest weight of the evidence.

{¶ 97} In a manifest weight challenge, the reviewing court must examine the entire record, weigh the evidence and all the reasonable inferences, consider the witnesses' credibility, and "determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved

for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶ 98} Williams contends that the trial court lost its way when it believed the victim. He claims that the victim "dissuaded police from conducting any follow-up investigation" and waited over two years to pursue charges against him. He maintains that the State's photographic evidence of the basement where the victim said the rape occurred do not match the victim's testimony. He further asserts that the evidence established that the victim was jealous of Williams's girlfriend, which is why she falsely accused him of raping her.

{¶ 99} We disagree with Williams that the trial court lost its way when it found him guilty of rape and kidnapping. The victim's testimony at trial was consistent with what she reported to police on May 28, 2019. The police officer who took the victim's initial statement on the day of the rape said the victim was hysterical, emotional, and crying when she was reporting what Williams did to her. The victim's testimony as to what occurred before, during, and after the rape was also consistent with what she told the SANE nurse on the day of the rape. The SANE nurse also testified that the victim's vagina was tender, there was redness just below her vaginal opening, and her cervix had "blood-tinged fluids inside," and the nurse said these injuries were consistent with the victim's narrative of what Williams did to her. And the victim's sister and mother both testified and corroborated the victim's testimony. The victim's mother and sister also stated at trial that when they

spoke to the victim after the rape, that the victim was "a mess," had been crying, and her face was "puffy."

{¶ 100} After review, we conclude that this is not the exceptional case in which the evidence weighs heavily against the convictions. We therefore overrule Williams's fifth assignment of error.

**F. Conclusion**

{¶ 101} After thoroughly analyzing Williams's arguments on appeal, we conclude that they either have no merit or do not rise to the level of prejudicial error. We therefore overrule his assigned errors and affirm his convictions.

{¶ 102} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_Michelle J. Sheehan_

MICHELLE J. SHEEHAN, PRESIDING JUDGE

LISA B. FORBES, J., and
SEAN C. GALLAGHER, J., CONCUR